UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GOODRICH CORPORATION and GIBSON, DUNN & CRUTCHER, LLP,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**U.S. ENVIRONMENTAL PROTECTION AGENCY,**<br><br>**Defendant.** | Civil Action No. 08-1625 (JDB) |

## MEMORANDUM OPINION

Before the Court are the cross-motions for summary judgment filed by Goodrich Corporation and Gibson, Dunn & Crutcher, LLP (collectively, "plaintiffs") and the United States Environmental Protection Agency ("EPA" or "defendant"). Plaintiffs have filed suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking to compel the production of two documents EPA has to date withheld from production. EPA argues that it has properly withheld both documents pursuant to FOIA's statutory exemptions. For the reasons set forth below, plaintiffs' and EPA's summary judgment motions are both granted in part and denied in part.

## BACKGROUND

At issue in this case are two EPA models used to analyze contamination at a site in Rialto, California ("the Site"). The Site has been occupied by several entities since World War II; Goodrich Corporation ("Goodrich") occupied the Site from 1957 to 1963. Compl. ¶ 8. Sometime after 1963, EPA discovered groundwater contamination in the nearby Rialto-Colton Basin. In 2003, EPA issued a Unilateral Administrative Order ("UAO") to Goodrich and another company pursuant to section 106 of the Comprehensive Environmental Response,

Compensation, and Liability Act. 42 U.S.C. § 9606. The UAO ordered the companies to investigate the contamination at the Site and to take certain remedial actions there. See Compl. Ex. 3.

EPA has developed, or is developing, two models related to the Site. One model, the "vadose zone model," "simulat[es] the downward movement of perchlorate through the vadose zone at the Site (i.e., the zone, approximately 420 feet deep, between the ground surface and the underlying groundwater)." Declaration of Wayne Praskins, October 20, 2008, ¶ 4. The second model, the "groundwater flow model," "simulates the movement of groundwater at the Site under varying conditions." Id. ¶ 9. This model is still in development, but EPA "plan[s] to make the groundwater model available" when it is complete in early 2009. Id. ¶ 10. Plaintiffs learned of these models in 2006. Plaintiffs allege that Jorge Leon, counsel for the California Regional Water Quality Control Board ("Regional Board"), informed Goodrich's counsel, Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), that EPA had developed a model demonstrating that Goodrich could not have been responsible for the contamination at the Site. Compl. ¶ 10.

On December 19, 2007, Gibson Dunn submitted a FOIA request seeking "all models, prepared by or for the U.S. EPA, regarding the groundwater contamination" at the Site. Compl. ¶ 11. EPA located the two models but withheld them, claiming the protection of FOIA Exemptions 5 and 7. EPA's Statement of Facts ¶ 6. Gibson Dunn filed an appeal, which EPA denied on September 12, 2008. Id. ¶¶ 7-8. Plaintiffs filed the current complaint one week later. Plaintiffs simultaneously sought limited discovery to explore the validity of EPA's claimed exemptions and an alleged waiver of Exemption 5 protection for the vadose zone model. On October 31, 2008, this Court issued an Order permitting plaintiffs to depose Mr. Leon and

another Regional Board employee, Kurt Berchtold, on limited issues related to the waiver claim. Now before the Court are the parties' cross-motions for summary judgment.

## STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings . . . and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment, however, "may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Any factual assertions in the movant's affidavits will be accepted as being true unless the opposing party submits his own affidavits or other documentary evidence contradicting the assertion. Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA requires a federal agency to release all records responsive to a proper request except those protected from disclosure by one or more of nine enumerated exemptions set forth at 5 U.S.C. § 552(b). The district court is authorized "to enjoin [a federal] agency from withholding agency records or to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B); see Kissinger v. Reporters Comm. for Freedom

of the Press, 445 U.S. 136, 139 (1980).  The agency has the burden of proving that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements."  Goland v. Central Intelligence Agency, 607 F.2d 339, 352 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980) (internal citation and quotation omitted); see also Maydak v. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000) (the government has the burden of proving each claimed FOIA exemption).  The district court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

## ANALYSIS

**I.  Groundwater Flow Model**

EPA argues that it properly withheld the groundwater flow model pursuant to FOIA Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  See 5 U.S.C. § 552(b)(5).  "'Courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege.'"  Rockwell Int'l

Corp. v. Dep't of Justice, 235 F.3d 598, 601 (D.C. Cir. 2001) (quoting Formaldehyde Inst. v. Dep't of Health and Human Servs., 889 F.2d 1118, 1121 (D.C. Cir. 1989)).  In the FOIA context, the deliberative process privilege applies to inter- or intra-agency documents that are both pre-decisional and deliberative.  See Baker & Hostettler LLP v. Dep't of Commerce, 473 F.3d 312, 321 (D.C. Cir. 2006).

      Plaintiffs challenge only the deliberative nature of the groundwater flow model.  Plaintiffs' theory is straightforward:  the model is purely factual and facts cannot be deliberative.  Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pls. Mem.") at 26.  Plaintiffs are correct that a long line of cases, beginning with Environmental Protection Agency v. Mink, 410 U.S. 73, 79 (1973), recognizes a distinction between factual and deliberative materials.  But the distinction is not as stark as plaintiffs portray it to be.  Indeed, the D.C. Circuit has cautioned against overuse of the factual/deliberative distinction.  See Dudman Commc'ns Corp. v. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  "Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies."  Montrose Chemical Corp. v. Train, 491 F.2d 63, 71 (D.C. Cir. 1974) (emphasis added).  In Montrose, the D.C. Circuit expressly retained the factual/deliberative distinction while recognizing "that in some cases selection of facts or summaries may reflect a deliberative process which exemption 5 was intended to shelter."  Id.

      In the current case, EPA asserts (and plaintiffs do not dispute) that the groundwater flow model is in draft form.  Declaration of Keith Takata ¶ 24.  As a general matter, "drafts" of documents are exempt from disclosure under the deliberative process privilege.  See, e.g., City of Va. Beach v. Dep't of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993); Dudman, 815 F.2d at

1569; Russell v. Dep't of Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1988). The draft groundwater flow model reflects EPA's deliberative process because "evolving iterations of the Model's inputs and calibration reflect the opinions of the staff currently developing the Model, which may not represent EPA's ultimate opinions relating to these matters." Id. ¶ 25. Therefore, even if the data plugged into the model is itself purely factual, the selection and calibration of data is part of the deliberative process to which Exemption 5 applies. See Montrose, 491 F.2d at 71. Therefore, EPA has properly withheld the groundwater flow model, even though it plans to release the complete or final model in the future.

**II. Vadose Zone Model**

The parties devote most of their briefing to the vadose zone model. EPA argues that Exemptions 5 and 7(A) justify its withholding of the model. Exemption 5, as discussed above, applies to inter- or intra-agency documents that would be privileged in the civil discovery context. See Rockwell, 235 F.3d at 601. According to EPA, attorney work product protection would justify withholding the vadose zone model in the civil discovery context. See Memorandum in Support of EPA's Motion for Summary Judgment ("EPA Mem.") at 6. Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). EPA argues that release of the model would interfere with its enforcement of the UAO it issued to Goodrich in 2003. As discussed below, under the circumstances here, neither exemption justifies EPA's withholding of the vadose zone model.

A.      *Exemption 5*

The parties dispute whether the vadose zone model is entitled to attorney work product protection in the first place. Work product protection only applies to documents "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). "Materials assembled in the ordinary course of business" do not receive work product protection. Advisory Comm. Notes to Rule 26(b)(3), 1970 Amendment. Plaintiffs argue that the model was prepared in EPA's ordinary course of business because "there is no plausible reason to presume that in this particular instance the model was created pursuant to anything other than the EPA's ordinary administration of its statutory duties." Pls. Mem. at 14. EPA responds that litigation was not so far-fetched when it prepared the model. Because EPA issued a UAO ordering Goodrich and other companies to remediate the Site and because the EPA often resorts to litigation to enforce UAOs, the argument goes, EPA prepared the model in anticipation of litigation. EPA Reply Memorandum in Support of Its Motion for Summary Judgment ("EPA Rep.") at 8-9. Each side has a point, but the Court need not resolve this dispute because, as discussed below, EPA has waived any protection that might have existed.

EPA waived any privilege protecting the vadose zone model because EPA shared the results of the model with the Regional Board, which in turn disclosed the results to Gibson Dunn. The Court arrives at this conclusion based on its resolution of three issues, two factual and one legal: whether EPA shared the results of the model with the Regional Board; whether the Regional Board shared those results with Gibson Dunn; and whether disclosing the model's results is sufficient to waive whatever privilege protected the model itself.

The first issue is the easiest. In the summer of 2006, EPA held a meeting with Regional

Board staff. EPA did not share the vadose zone model itself at that meeting. EPA did, however, give a slide presentation of both the preliminary results of the model and the inputs used to arrive at those results. See Deposition of Kurt Berchtold at 58-60; see also id. at 52-53 (testimony establishing that Mr. Praskins telephonically divulged the results of the vadose zone model to Mr. Berchtold). This fact is undisputed.[1]

The second issue -- whether the Regional Board shared the results with Gibson Dunn -- is closer. Two Goodrich attorneys, Pete Duchesneau and Jeffrey Dintzer, claim that they had several conversations in August 2006 with Jorge Leon, counsel for the Regional Board. See Declaration of Pete Duchesneau ¶ 4; Second Supplemental Declaration of Jeffrey Dintzer ¶ 3. According to Messrs. Duchesneau and Dintzer, Mr. Leon conveyed the results of the vadose zone model during those conversations. In plaintiffs' deposition of Mr. Leon, however, the deponent proved intractable, repeatedly claiming not to remember sharing the results of the model with the Gibson Dunn attorneys. See, e.g., Deposition of Jorge Leon at 33-34. Yet what might in other circumstances constitute the kind of factual dispute to defeat summary judgment does not defeat it here. Mr. Leon's testimony does not create a genuine and material factual dispute. Mr. Leon does not deny that he transmitted the results of the model to Gibson Dunn attorneys; he simply does not remember doing so. Without the benefit of useful testimony from Mr. Leon, the Court is left with the declarations of Gibson Dunn attorneys. To be sure, the Court is wary of such

---

[1] EPA argues in its Reply that it did not disclose the results of the model to the Regional Board because it presented only preliminary results at the meeting. EPA Rep. 5-8. But EPA does not contend that the results in the final model are substantively different than the preliminary results presented to the Regional Board. The Court therefore gives no weight to EPA's suggestion that it did not disclose the model's results because the results hypothetically could have changed after the presentation. In any event, as reflected in the Court's Order, defendant is ordered to produce the model as it existed at the time of the meeting.

offers of proof because they could be viewed as self-serving. But plaintiffs supplement those declarations with contemporaneous redacted time sheets from Mr. Dintzer. Those records indicate that Mr. Dintzer "confer[red] with J. Leon re water board model" and held a "teleconference to Leon re model from EPA" in August 2006. See Second Supp. Dintzer Decl. Ex. A. These contemporaneous records, coupled with the sworn declarations, are sufficient to overcome any doubts created by Mr. Leon's equivocal testimony. The Court is therefore persuaded that the Regional Board shared with Goodrich's counsel the results of the vadose zone model that they learned from EPA.

That brings us to the final, legal issue: whether the Regional Board's disclosure of the results of the vadose zone model to plaintiffs waives whatever privilege protected the model itself. Plaintiffs argue that "[w]ork product is 'disclosed' where an outside party has learned the 'gist' of the document's contents." Pls. Mem. at 18 (citing Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington, 103 F.R.D. 52, 63 (D.D.C. 1984)). EPA counters that the gist standard is inapplicable here. EPA Rep. at 3-5 (citing In re United Mine Workers of America Employee Ben. Plans Lit., 159 F.R.D. 307 (D.D.C. 1994)). According to EPA, plaintiffs rely on a subject matter waiver theory, and subject matter waiver does not apply to waiver of attorney work product protection.

To be sure, the test for waiving attorney work product protection is more stringent than the test for waiving attorney-client privilege. See United Mine Workers, 159 F.R.D. at 310. Under certain circumstances, however, disclosure of some attorney work product may result in a waiver of other attorney work product. See In re Sealed Case, 676 F.2d 793, 817 (D.C. Cir. 1982). The key inquiries are policy-driven. Is the party claiming protection doing so in a way

consistent with the purpose of the privilege? And is the party's claim to work product protection "necessary to maintain a healthy adversary system"? See id. at 818. Several factors figure into the analysis: whether disclosure was intentional or inadvertent, see id. at 817-18; see also In re Sealed Case, 877 F.2d 976, 980 (D.C. Cir. 1989); the breadth of the waiver sought, compare United Mine Workers, 159 F.R.D. at 311-12 (holding that a request for an open-ended set of documents cut against a finding of waiver), with Wichita Land & Cattle Co. v. Am. Fed. Bank, F.S.B., 148 F.R.D. 456, 457 (D.D.C. 1992) (compelling disclosure of two specific documents); and the extent to which the requested documents would reveal litigation strategies or trial preparations, see Bowles v. Nat'l Ass'n of Home Builders, 224 F.R.D. 246, 258 (D.D.C. 2004).

Here, each factor favors plaintiffs. EPA purposely shared the results of the vadose zone model with the Regional Board. Although EPA was not responsible for the next step -- sharing the results with Goodrich -- EPA's failure to "jealously guard[]" its protected information cuts against it. See In re Sealed Case, 877 F.2d at 980 ("[T]he confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost even if the disclosure is inadvertent.") (internal citations and quotations omitted). EPA does claim that it asked the Regional Board to maintain the confidentiality of the results, but testimony from Mr. Berchtold undercuts EPA's claim. See Berchtold Dep. at 79-80 (testifying that he did not recall a request by EPA to keep the vadose zone model's results confidential). Nor did EPA require Regional Board employees attending the presentation to sign a written confidentiality agreement. Id. Mr. Berchtold's testimony demonstrates that EPA did

not exercise the kind of "zealous stewardship" of attorney work product that the law demands. See Wichita Land & Cattle, 148 F.R.D. at 460.

The next consideration is the breadth of the waiver sought. Plaintiffs claim that EPA waived work product protection for a single document -- the vadose zone model -- when EPA disclosed the inputs and results of that model to the Regional Board. This factual scenario therefore resembles In re Sealed Case, 877 F.2d at 817-18 (eight specific documents at issue), and Wichita Land & Cattle, 148 F.R.D. at 457 (two specific documents at issue). The request is not for an open-ended list of all documents related to a certain subject matter.

Moreover, disclosure of the model itself would not reveal EPA's litigation strategies or trial preparations. The model does not contain attorney opinions or mental impressions of counsel. The model contains facts. And the model is not in draft form, so the factors counseling against disclosure of the draft groundwater flow model do not apply to the vadose zone model. This analysis demonstrates that withholding of the model is neither necessary to maintain a healthy adversary system nor consistent with the purpose of work product protection.

Having concluded that EPA shared the results of the vadose zone model with the Regional Board, that the Regional Board then shared the results with Goodrich, and that sharing the results of the model constitutes a waiver of any privilege that protected the model itself, the Court holds that Exemption 5 does not protect the vadose zone model from disclosure because EPA, by its actions, has waived that protection which it might otherwise have.

B.   *Exemption 7(A)*

EPA also contends that the vadose zone model is protected from disclosure under Exemption 7(A) of FOIA. Exemption 7(A) allows an agency to withhold "records or information

compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "To fit within Exemption 7(A), the government must show that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." Manna v. Dep't of Justice, 51 F.3d 1158, 1164 (3d Cir. 1995).

First is the requirement that a law enforcement proceeding be pending or prospective. EPA asserts that it meets this requirement because the 2003 issuance of a UAO carries with it a sufficiently high likelihood of an enforcement proceeding. EPA Rep. at 12-13 (citing General Electric Co. v. Environmental Protection Agency, 18 F. Supp. 2d 138 (D. Mass. 1998)). Plaintiffs respond that the UAO cannot qualify as a pending or prospective enforcement because it has already been issued. Pls. Mem. at 24 (citing Firestone Tire & Rubber Co. v. Coleman, 432 F. Supp. 1359 (N.D. Ohio 1976)). To be sure, the case cited by plaintiffs, which deals with investigatory orders issued by the National Highway and Traffic Safety Administration ("NHTSA"), contains a helpful dictum that "[a] NHTSA administrative investigation cannot be deemed 'pending' for purposes of the (b)(7)(A) Exemption after NHTSA issues a final order which becomes the subject of de novo judicial review because the agency is required to complete its investigation prior to issuing a final administrative decision." See Firestone Tire & Rubber, 432 F. Supp. at 1369 n. 21. But General Electric, cited by EPA, is more persuasive. That case deals squarely with the same issue faced here: whether a UAO qualifies as a pending or prospective law enforcement proceeding for the purposes of Exemption 7(A). See 18 F. Supp. 2d at 143-44 (applying Mapother v. Dep't of Justice, 3 F.3d 1533 (D.C. Cir. 1993), and Bristol-

Myers Co. v. Federal Trade Comm'n, 424 F.2d 935 (D.C. Cir. 1970)).  In General Electric, the court examined the variety of potential enforcement proceedings that could follow issuance of a UAO, concluding that the likelihood of post-UAO enforcement proceedings is sufficiently great to satisfy the first requirement for Exemption 7(A) -- the existence of an enforcement proceeding.  See id.  This Court is not persuaded otherwise.

EPA does not, however, satisfy the second requirement -- a reasonable likelihood of articulable harm.  The harm that EPA articulates is as follows: "Release of [the vadose zone model] would cause Defendant harm by allowing the Plaintiffs access to Defendant's litigation preparation before Defendant has had an opportunity to file a complaint, propound discovery and expert witnesses and prepare expert reports."  EPA Rep. at 14.  Plaintiffs respond that this kind of harm misses the point of Exemption 7(A), which, according to plaintiffs, is concerned with harm caused by opportunistic use of FOIA by the targets of an investigation.  Pls. Mem. at 21-24.

Plaintiffs are correct.  Exemption 7(A) protects from disclosure information that would permit the target of an investigation to destroy relevant evidence or fabricate a fraudulent alibi.  See Alyeska Pipeline Serv. Co. v. Environmental Protection Agency, 856 F.2d 309, 312 (D.C. Cir. 1988).  The exemption also seeks to prevent the target of an investigation from intimidating witnesses who might otherwise cooperate with an ongoing investigation.  See NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978).  Here, there is no evidence for plaintiffs to destroy; nor are there witnesses for them to intimidate.  The contamination at the Site took place decades ago and Goodrich vacated the premises in 1967.  Release of the vadose zone model would not threaten the integrity of EPA's enforcement efforts by enabling Goodrich to engage in any inappropriate means to undermine it.

EPA would undoubtedly be harmed if the model exonerates Goodrich, as plaintiffs say it does. If the model demonstrates that Goodrich could not have been responsible for contamination at the Site, then Goodrich could cease compliance with the UAO and use the model in its own defense should EPA initiate enforcement proceedings. Under this hypothetical, plaintiffs will have received some discovery even before the initiation of litigation. But this litigation advantage is not the kind of harm Exemption 7(A) is intended to guard against. Exemption 5, not Exemption 7(A), covers privileges that would arise in the civil discovery context, and the Court has already rejected EPA's claim that Exemption 5 applies. Therefore, EPA may not withhold the vadose zone model under Exemption 7(A). Indeed, a conclusion that a civil litigation (or discovery) advantage potentially realized by the production of a document is enough to warrant protection under Exemption 7(A) would risk unbounded expansion of that law enforcement exemption.

## CONCLUSION

For these reasons, plaintiffs' summary judgment motion to compel disclosure of the groundwater flow model is denied and EPA's summary judgment motion seeking to withhold the groundwater flow model is granted. On the other hand, plaintiffs' summary judgment motion to compel disclosure of the vadose zone model is granted and EPA's summary judgment motion seeking to withhold the vadose zone model is denied. A separate Order has been issued today.